Peter A. HALMOS, Individually and d/b/a Pah Corporation, and Pah Co., Appellants,

v.

BOMBARDIER AEROSPACE CORPORATION, Appellee.

No. 05–08–00865–CV.

Court of Appeals of Texas, Dallas.

June 2, 2010.

Michael J. Stanley, Stanley, Frank & Rose, LLP, Houston, for Appellants.

Robert P. Latham, Jackson & Walker, L.L.P., Dallas, for Appellee.

Before Justices FITZGERALD, MURPHY, and MYERS.

## OPINION

Opinion By Justice MURPHY.

This appeal involves disputes relating to the purchase and operation of a Learjet 31A aircraft. PAH Co.,[1] as the purchaser of a fractional interest in the jet, appeals the judgment entered in favor of Bombardier Aerospace Corporation after a directed verdict against PAH on its breach of contract claims and a jury verdict in favor of BAC on BAC's breach of contract claims.[2] PAH's president and owner, Peter A. Halmos, also appeals the trial

---

1. PAH Co. is also known as PAH Corporation and PAH Corp.

2. The jury also returned a verdict against PAH on its additional claims against BAC, including fraud claims, and the trial court granted a directed verdict in favor of Halmos on BAC's claims against him. No error is asserted as to those claims.

court's order striking his individual counterclaim. We conclude the trial court erred in granting the directed verdict against PAH and in its jury instruction on conditional tender as to BAC's breach of contract claims. Accordingly, we reverse the judgment against PAH as to those claims and remand for further proceedings. Otherwise, the judgment is affirmed.

## Background

PAH is a real estate and investment company based in West Palm Beach, Florida. BAC is a Dallas-based corporation whose business includes the manufacture, sale, and operation of aircraft. As part of that business, BAC sold fractional interests in its aircraft through its FlexJet program and managed a fleet of planes under that program. In June 1999, PAH purchased a one-eighth interest in a Learjet 31A for $773,000 and contracted with BAC for management services and 100 annual flight hours. The transaction was governed by five documents, two of which are at issue—the management agreement and the purchase agreement.

The terms of the management agreement required PAH to pay in advance a predetermined monthly management fee due on the first day of each month. That amount was $7308 and was subject to annual escalation. That agreement also required PAH to pay, within thirty days after the date of invoice, a variable rate for the costs associated with each flight taken. In connection with the variable rate charges, PAH paid a deposit of $10,345.06. This amount represented "a sum equal to one month's estimated Variable Rate charge to be used by [BAC] to defer the cost of maintenance, fuel, and miscellaneous expenses incurred by BAC and as a result of invoicing Variable Rate charges in arrears." The deposit was to be re-turned at the expiration of the agreement, after PAH paid all sums due. The management agreement provided that in the event PAH did not pay any required amount when due, or within a ten-day notice-and-cure period, BAC could declare PAH in default, deny PAH use of the jet, and, at its discretion, repurchase PAH's fractional interest. The repurchase would be at a twenty percent discount from the fair market value as determined by the parties' mutual agreement, or absent such agreement, by a mutually agreed upon independent appraiser or a majority of three independent appraisers. This repurchase provision was also contained in the purchase agreement.

The parties' breach of contract claims involve disputed variable rate fees for flights between April 1999 and November 2001. Those fees included charges for flights Halmos asserted were to be non-stop, but required fuel stops. Halmos claimed the jet was not performing as represented at the time of purchase and BAC was not operating and managing the jet safely. Halmos worked with BAC staff during that time trying to resolve the issues. As a result, BAC made some concessions and offered credits. By November 2001, however, BAC records reflected PAH had an outstanding balance of $46,497.69.

On November 20, 2001, BAC notified PAH by letter of the outstanding balance and its intent to suspend PAH's account if payment was not received within thirty days. On December 10, PAH sent a check for $46,497.69, which contained a handwritten notation that it was "*IN FULL PAYMENT* PAID UNDER PROTEST AND DURESS WITHOUT PREJUDICE. ALL RIGHTS RESERVED." The cover letter stated that "[u]nder extreme duress and protest, PAH ... remits in full payment $46,497.69 pursuant to your letter of

November 20." BAC rejected the check and, on January 11, 2002, declared PAH in default, suspended flight privileges, and notified PAH that it intended to exercise its right to repurchase PAH's interest in the jet. BAC sent PAH the documents necessary to repurchase the jet a week later and offered a net repurchase price of $840,557.48. PAH rejected the repurchase offer and retained its fractional interest, but BAC denied PAH use of the jet.

A year and a half later, PAH executed and tendered the repurchase documents. BAC did not accept the documents, but drafted new documents showing a net repurchase value of $321,367.05. PAH rejected this offer, and no other offers were tendered.

In June 2004, BAC sued Halmos individually and "d/b/a PAH Corporation and PAH Co." Nine months later, after Halmos had answered the lawsuit denying he individually was a proper party, BAC added PAH as a separate defendant. In its live pleading at time of trial, BAC alleged breach of the management agreement for failure to pay amounts due. BAC also alleged breach of the management and purchase agreements for failure to reconvey the jet. In addition to its request for actual damages, attorney's fees, interest, and costs, BAC sought recovery under the doctrine of quantum meruit and reconveyance of the jet through specific performance, injunctive relief, and a declaratory judgment.

PAH, asserting it was "misnamed" in BAC's petition as "Peter A. Halmos d/b/a PAH Corporation," answered the original suit with a general denial and counterclaim. Halmos did not individually counterclaim, but PAH's pleading alleged that "should it be determined by this court that PAH has not been misnamed and that Peter Halmos individually is the correct party defendant, which is not admitted and

is specifically denied, then this counterclaim is being brought by Peter A. Halmos individually." Over the course of the three years leading to trial, PAH amended its answer and counterclaim numerous times. An amended pleading filed in April 2005 included defenses and sworn denials on behalf of Halmos and PAH, but Halmos's prior assertion that he was counterclaiming individually "should it be determined" he was the correct party, was omitted. Only PAH asserted counterclaims from that date forward. In their live pleading at the time of trial, the "Fifth Amended Original Answer and Sixth Amended Original Counterclaim" filed November 2006, PAH and Halmos asserted defenses that included fraudulent inducement and accord and satisfaction. PAH also alleged causes of action for (1) fraud, fraudulent inducement, and negligent misrepresentation based on BAC's statements at the time of purchase concerning the jet's range and flight capabilities; (2) breach of contract on eleven grounds, including unsafe operation of the jet, demand for payments not due, failure to "give promised credits," refusal of PAH's check for $46,497.69, and wrongful termination; (3) conversion of the jet based on BAC's denial of use; and (4) breach of agreement to repurchase the jet. PAH sought rescission of the agreements, actual and punitive damages, the January 2002 repurchase price of the jet, the difference between the value of the plane as represented and as received, and attorney's fees.

The case was tried to a jury for six days. At the close of evidence, the trial court granted directed verdicts in favor of Halmos individually on all of BAC's claims and against PAH on its breach of contract claims against BAC. The jury then returned a verdict against PAH on the remainder of its claims. As to BAC's breach of contract claims against PAH, the jury

found that PAH had breached the management agreement, but not the purchase agreement, and awarded damages in the amount of $156,678.78. The jury also found that the fair market value of a one-eighth interest in the jet was $363,043.77 at the time of trial and BAC was entitled to attorney's fees in excess of one million dollars. The trial court subsequently rendered judgment on the jury's verdict and also ordered that PAH's fractional interest in the jet be reconveyed to BAC "for the total consideration of $373,389.63"—the fair market value of the jet as determined by the jury, plus a credit in favor of PAH for the deposit it had paid at the time of purchase. This appeal followed.

## Evidence

Our review of the issues related to the parties' breach of contract claims requires that we consider the entire record, which includes testimony from fifteen witnesses the jury heard over the course of seven days. Testimony from six of the witnesses is significant to our analysis. We therefore include a lengthy recitation of the testimony of those witnesses: (1) Halmos; (2) Dennis Keith and (3) Michael Riegel, both of whom signed the purchase agreement on BAC's behalf; (4) Dylan Haynie, BAC's contract administrator at the time PAH purchased its interest in the jet and counsel at the time PAH tendered the $46,497.69 check; (5) Shelly Hedrick, BAC's assistant to the president and owner complaints representative; and (6) Allyn Needham, BAC's expert on damages. We begin with testimony from Halmos.

Halmos testified he purchased the fractional interest in the jet primarily for urgent and last-minute business trips between West Palm Beach and two northeastern cities—Providence, Rhode Island, and New York. He was looking for "fast and high," and BAC's marketing materials described the jet as "a 548 mph time machine" that could fly over most weather. Halmos testified the approximate 1000 mile distance between West Palm Beach and Providence, and West Palm Beach and New York City, fell within the jet's maximum 1500 mile range. He said BAC sales director Les Space represented that those flights would be non-stop, except in extreme weather when safety issues would require the flight to be canceled. Although flying privately "was a lot more expensive" than flying commercial—about $20,000 round trip contrasted with $1000 round trip—Halmos was willing to pay more in order to get to Providence and New York City non-stop and on time. The flights with disputed fuel stops were primarily between Providence and West Palm Beach. The stops resulted in additional fees and additional flight time, which were assessed against PAH.

The first flight with a stop was on April 16, 1999. Halmos claimed the flight should have been non-stop because of the jet's capabilities and because it could have flown over water had the jet been equipped with a life raft. Halmos raised the issue with BAC, and his concerns were addressed by letter from Hedrick, BAC's owner complaints representative. Hedrick explained in the July 1999 letter that each flight is handled on a case-by-case basis and that fuel reserves can be affected by weather, headwinds, holding patterns, weight, and runway length. Halmos disagreed and continued the "back and forth" with BAC staff over the next two years.

In March 2001, PAH received a letter from BAC finance vice president Serge Dupois stating the account was past due in the amount of $24,499.47. Dupois also stated that BAC would suspend PAH's account if payment was not received within thirty days. Halmos responded by letter

denying PAH had a "significant outstanding balance." He continued talking with BAC representatives and the discussions led to a May 14, 2001 letter from Hedrick informing Halmos that because of confusion caused by sales director Space, "all ... flights from Florida to New York or Rhode Island will be billed as non-stop flights whether ... a fuel stop actually occurs." Hedrick also informed Halmos that certain disputed flights would be credited and re-billed as non-stop flights.

Halmos responded to Hedrick by letter dated May 26 asking Hedrick "to undertake some research and to look into different trips." Hedrick replied on June 4, confirming all flights from Florida to New York and Rhode Island would be billed as non-stop flights. Hedrick attached a spreadsheet summarizing all the trips with fuel stops and the credits BAC would be issuing. A few days later, Halmos received a "side letter agreement" reflecting the "fuel-stop concession" and a "raft provision concession"—flights between Florida and New York or Rhode Island requiring a different flight plan due to the lack of an onboard life raft would be billed at a reduced rate. Halmos did not sign the "side letter agreement," believing it was inconsistent with what Hedrick had told him and did not "get at the core problem."

Wanting to "figure out" what BAC was saying, Halmos forwarded Hedrick's letter to his accountants, who, after contacting BAC's billing department, responded to Halmos by a September 2001 letter. The accountant letter detailed the credits received, flight invoices that would not be adjusted, invoices Halmos had directed to be held, and new invoices received. The letter also informed Halmos that, based on BAC's records and taking into account all credits, the amount due as of September 6 was $45,386.87. Halmos testified he continued the dialogue with BAC, and one of

its sales directors recommended that PAH purchase a larger plane. Halmos subsequently received the November 20 letter informing him of the outstanding balance of $46,497.69.

The letter was from Christopher Crawshaw, another BAC finance vice president. The letter did not identify any invoices or provide details. Halmos testified he did not know what the $46,497.69 represented. Halmos responded by asking Crawshaw for details and supporting documentation. He also asked Hedrick to look into the matter. Halmos received no response from Crawshaw or Hedrick. Instead, he received a letter from Meredith McKee, a BAC owner relations representative, informing him she would be handling the matter. In her letter, McKee informed Halmos that, at Hedrick's request, she had reviewed Hedrick's June 2001 letter and Crawshaw's letter and the outstanding balance quoted by Crawshaw was current and correct.

Halmos testified that to avoid losing the jet, he authorized payment of the claimed balance. He instructed his counsel to send the check with a cover letter stating the amount was disputed and payment was being tendered in full pursuant to Crawshaw's letter so he would not lose use of the jet. The December 10 letter addressed to Crawshaw stated that "[u]nder extreme duress and protest, PAH ... remits in full payment $46,497.69 pursuant to your letter of November 20." Halmos testified the reason for including "in full payment" was to ensure BAC credited him for the amount demanded. He explained he did not agree with the amount and wrote "All rights reserved" on the check to protect his right subsequently to "straighten [everything] out."

Halmos testified he "felt very upset" when BAC returned the check a week later. Halmos's attorney wrote to BAC's

attorney on December 20, while Halmos wrote to McKee on December 31. McKee did not respond, and PAH's flight privileges were suspended.

On January 20, 2002, Halmos wrote another letter to McKee and re-tendered the $46,497.69 check, hoping McKee "would use some reason and at least look at the contract." In the letter, he offered to continue paying the management fees. Halmos explained that he needed the plane and wanted it returned.

Halmos testified he received the repurchase documents, but he did not sign them until eighteen months later because he needed the plane. He said he did not seek his own appraiser when BAC responded with an updated repurchase agreement; he "saw no purpose" because the value had decreased by two-thirds. Halmos's understanding of how the fair market value would be determined under the repurchase provisions of the management and purchase agreements was that if the parties could not agree to a value, they would mutually agree on an appraiser to determine the value. If they could not agree on an appraiser, each party would choose an appraiser and the appraisers would then choose a third appraiser. Halmos testified BAC did not follow the determined procedure—BAC did not offer to talk to him about an agreed amount, did not attempt to agree on an independent appraiser, and did not suggest each party hire an appraiser. Halmos admitted he too had failed to follow the procedure.

After losing use of the jet, Halmos flew charter flights between January 2002 and the date he signed the repurchase documents. He testified that the cost of those flights ranged from $10,595 to $17,519.

Keith, who signed the purchase agreement as president on BAC's behalf, testified as to the different transaction documents. He explained the purpose of the repurchase agreement was to "free up that portion of the title" and protect the other fractional owners of the aircraft. Keith testified that, under the governing documents, the owner agreed the pilot in command had ultimate authority for the flight. He identified factors that can affect a flight: traffic and directions from air traffic control personnel; weather; alternative routes taken to avoid bad weather; wind; passenger and cargo weight; and fuel temperature.

Keith testified he became aware of Halmos's dissatisfaction with certain flights and ultimately authorized the billing adjustments for flights with stops. He also was aware Halmos was provided a larger plane "a number of times" so he could fly non-stop. He disagreed that having a life raft would have "made a big difference." He explained that federal regulations require an onboard life raft and vests any time an aircraft is 100 nautical miles or thirty minutes from shore, whichever is greater. An aircraft with a life raft could travel a different route between West Palm Beach and Providence, but the time saved would "probably" be no more than seven minutes; no guarantee existed that on any given day, the water route would be faster than the land route. Keith could not recall any significant number of concessions being made to customers other than PAH, and he denied any of the other seven members who shared interests in the jet with Halmos complained about the jet's range. When asked to review an invoice BAC sent PAH in October 2001 that charged for a fuel stop on a September 2001 flight from West Palm Beach to New York City, Keith agreed the charge was a billing error based on the previous concession.

Haynie, BAC's counsel and contract administrator who testified as BAC's representative, stated that he worked with Hal-

mos during the purchase negotiation phase. He said Halmos did not request during that phase that the jet's range be included in the governing documents; nor did he seek to condition the purchase on the jet flying non-stop from one particular city to another.

Haynie next was involved with PAH and Halmos in late 2001. The December 10 letter from PAH's counsel and the $46,497.69 check were brought to his attention. Haynie testified the handwritten notations on the check "threw up red flags that if we did accept this, it would not only [be] in full payment of the past due amounts, but of all amounts ... owed." Haynie researched Texas law, which suggested BAC might be waiving rights to collect all amounts due, including current amounts, if BAC cashed the check. Because PAH had used the jet and incurred additional fees since the November 20 letter demanding $46,497.69, Haynie did not "want to cash [the check] and in essence give [Halmos] all of those additional flights for free." Haynie said he took no comfort in the fact that the letter accompanying the check stated that it was in full payment pursuant to the November 20, 2001 letter because "the check is what I defaulted to. And the check said on the left hand full payment, and that ... means that's in full payment of all amounts outstanding whether they're past due or otherwise."

Haynie returned the check on December 17. At that point, BAC claimed the outstanding balance was $86,000. Haynie admitted that figure included the $7600 January management fee that was not due until January 1, 2002, as well as variable rate fees for flights taken mid-November 2001 and paid December 11. It also included fees for which PAH had not yet been billed and were not yet due, and a flight that should have been billed as non-stop but was not. Haynie agreed that

BAC should issue a credit on the invoice for the flight that was billed improperly. He disagreed, however, that it was unfair to include the fees for which PAH had not yet been billed, claiming Halmos knew the charges had been incurred in connection with flights taken after November 20 and knew he would have to pay for those flights.

Haynie responded to the December 20 and 31 letters from Halmos and his counsel by letter dated January 4, 2002. In Haynie's letter, he informed counsel that PAH's outstanding balance was $78,000, of which $62,000.50 was past due. Haynie demanded payment within seven days and stated the contract would be terminated if payment was not received. Attached to the letter were all unpaid invoices from June 1999 through December 8, 2001, notes showing the interest calculation, and an accounting summary reflecting how the amount claimed was determined. Haynie testified that this past due amount differed from the amount due in the earlier letters because some invoices had since been paid and additional flights had been taken. He admitted again that the amount owed reflected amounts that had already been paid or were paid before January 11, 2002. The amount also included interest on the $46,497.69, as well as the February management fee that was not due until February 1.

On January 11, 2002, when PAH had not remitted payment, Haynie sent another letter. In this letter, addressed to Halmos, BAC declared PAH in default for failing to timely pay its fees in accordance with the management agreement, suspended PAH's flight privileges, and exercised its right to repurchase the interest in the jet. Haynie again attached to the letter an accounting summary that reflected past due amounts, as well as February's management fee and an additional amount rep-

resenting an adjustment to the January management fee. According to Haynie, the amount due at that time was $63,264.53, of which $54,332.52 was past due. When PAH's re-tendered $46,497.69 check "ma[d]e it through to [him]," Haynie again rejected it. He claimed the check was outside the cure period and did not represent payment in full.

According to Haynie, no discussion between PAH and BAC occurred from January 17, 2002 to June 13, 2003. He did not believe Halmos wanted to resell PAH's interest in the jet; he opined that if PAH had wanted to resell its interest, Halmos could have signed the documents or informed BAC he thought the fair market value was different and started the process of determining the jet's fair market value. Haynie testified that as of the date of trial, PAH was still a one-eighth owner of the jet and there was still an outstanding balance "above the 46,000."

BAC claimed that to mitigate damages, it leased the jet to Delta AirElite in January 2006 for $34,800 per month. The lease required Delta to provide insurance for the jet and pay for maintenance and repairs. BAC claimed this relieved it of any financial obligations with respect to the jet. BAC had not paid PAH its share of the lease payments but stated it was willing to do so.

Hedrick, BAC's owner complaints representative, testified she handled Halmos's "issues" concerning the life raft and jet range in 1999 and again in 2001. Her initial work led to the July 1999 letter, in which BAC concluded that the fuel stop during the April 16, 1999 flight was necessary and would have occurred even if the jet had been equipped with a life raft. Halmos did not respond to her letter, but spoke with a BAC sales associate in October 1999 and expressed frustration over another flight from Providence that required a fuel stop. That sales associate's typed notes reflected that Halmos had informed her that (1) he "was guaranteed" that the trips from Providence would be non-stop, and (2) the guarantee was the main reason he became an owner. Halmos also stated that he had been told the reason for the stops was that the jet did not have a life raft on board and had to be diverted from the water, adding time and costs to the trips. Hedrick acknowledged a jet could take a more direct route over water with a life raft on board and that initially the Learjet 31As were not equipped with life rafts.

Hedrick next worked with Halmos in May 2001 in connection with a "billing exception." She wrote the May 14 letter explaining that all flights from Florida to New York or Rhode Island would be billed as non-stop even if a stop occurred. She also wrote the June 4 letter addressing Halmos's continued concerns with the jet's performance, billing, and the life raft. Hedrick testified she reviewed files and accounting records and spoke to different department heads prior to writing the letter "to answer everything [she] could." Based on her research, she prepared the spreadsheet listing all flights with stops and noting the charges for those flights with adjusted fees due to fuel stops.

Four months later, on October 15, Halmos called upset that a scheduled flight to Providence would stop for fuel and that a requested life raft would not be available. Halmos did not speak to Hedrick. The BAC representative who spoke with Halmos recommended that a sales director call Halmos "[d]ue to previous owner issues with [aircraft] performance."

Halmos wrote to Hedrick at the end of November asking her to review Crawshaw's letter claiming that $46,497.69 was past due. Having done all she believed she could for Halmos and thinking "fresh

eyes" would help, Hedrick forwarded Halmos's letter to McKee. Hedrick received a subsequent letter from Halmos and, at that point, "turned it over to legal." Hedrick acknowledged that an advantage of the Learjet 31A was its ability to fly over bad weather and above traffic. She also testified that other jet owners had raised questions about fuel stops and the jet's ability to fly non-stop.

Needham, the damages expert, testified that BAC asked him to (1) review invoices, credits, and payments by PAH to ensure the reported outstanding balances were accurate; (2) determine the sum of management fees and upgrade invoices between February 2002 and January 2004— the normal expiration of the contract; (3) calculate interest on the outstanding balances as well as the management fees and upgrades total; and (4) calculate the portion of revenue due PAH from certain lease payments. Based on his review, Needham determined that the outstanding balance at the end of January 2002 was $56,846.78. That sum differed from the January 11, 2002 amount of $63,264.63 calculated by Haynie because it did not include February management fees, but it did include a pro-rated portion of the adjustment to the January management fee, as well as international fees for flights taken in November 2001.

Needham also determined the sum of the management fees and upgrades to the aircraft through January 2004 was $204,231.88. The interest on both this amount and the outstanding balance was $199,796.16. Needham testified the amounts BAC reported as due in its correspondence to PAH were accurate. He also testified that PAH's share of the lease revenue was $104,400.

Needham admitted Haynie's total of $63,264.63 included February's management fee, which was not applicable because the agreements had been terminated. Needham also admitted that he did not give PAH any credit for that portion of January's management fee that covered the period following termination through the end of the month. That amount would have been "roughly" $5000. He also did not take into consideration any disputes PAH had as to invoices for flights with stops; he assumed all invoices were appropriate. If he considered the deposit Halmos paid at the time of purchase, applied it as a credit and pro-rated the January management fee, the outstanding amount would be less than $46,000 and would have been covered by the rejected $46,497.69 check. Without pro-rating the January management fee and without any credits for disputed flights, but applying the deposit as a credit, PAH would owe $3.23.

PAH also called Riegel as a witness; Riegel was BAC's vice president of marketing and sales who also signed the purchase and management agreements. He supervised sales director Space and sat on an executive committee that met annually to discuss strategy. He reported to BAC upper management that the Learjet 31A lacked the range of its primary competitors. Riegel testified that BAC knew before PAH purchased an interest in the jet that the jet could not fly non-stop easily from West Palm Beach to New York or Providence "day in and day out" because of factors such as weather, traffic, headwinds, and pilot experience and style. BAC also knew of owner complaints about the range. BAC had a protocol to handle those complaints. If the complaint concerned the cost associated with stopping, BAC would issue credits. If the complaint focused on "making" the flight, BAC would give the owner operational upgrades—a plane with a longer range for specific route requirements. If the complaints persisted, BAC "would work very hard to persuade

[customers] to transition" to an aircraft with a longer range. In Riegel's opinion, the purchase agreement "technically" guaranteed the jet's performance because it was predicated on a certificate of airworthiness that had a range associated with it.

### PAH's Appeal

#### Jury Charge Error

We first address PAH's second issue on appeal, in which PAH challenges the trial court's instruction that PAH's tender of $46,497.69 was a conditional tender. PAH's focus is the following portion of the charge:

QUESTION 1:

Did PAH Co. fail to comply with the Management Agreement?

You are instructed that the tender of $46,497.89 [sic] was a conditional tender that BAC was not required to accept. Answer "Yes" or "No".

The instruction followed the trial court's determination, during an informal charge conference, that the check PAH tendered with the notation "in full payment" was conditional as a matter of law. The jury answered "yes" to the first question, and that answer formed the basis of the verdict. PAH contends the instruction that its tendered check was conditional was error because the issue of whether the tender was conditional was a fact question for the jury and because the conditional tender instruction was an incorrect statement of law and an improper comment on the weight of the evidence.

Texas Rules of Civil Procedure 277 and 278 require a trial court to submit to the jury questions, definitions, and instructions that are raised by the written pleadings and evidence and are necessary to enable the jury to render a verdict. TEX.R. CIV. P. 277, 278; *Hani v. Jimenez,* 264 S.W.3d 881, 885 (Tex.App.-Dallas 2008,

pet. denied). A proper jury instruction (1) assists the jury, (2) accurately states the law, and (3) is supported by the pleadings and evidence. *See Tex. Workers' Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex.2000) (per curiam); *Bryan v. Watumull,* 230 S.W.3d 503, 508 (Tex.App.-Dallas 2007, pet. denied). An instruction that misstates the law as applicable to the facts or misleads the jury is improper. *Bryan,* 230 S.W.3d at 508 (citations omitted). So, too, is an instruction that comments directly on the weight of the evidence. *See* TEX.R. CIV. P. 277; *Redwine v. AAA Life Ins. Co.,* 852 S.W.2d 10, 14 (Tex.App.-Dallas 1993, no writ). An impermissible comment on the weight of the evidence occurs when the judge assumes the truth of a material controverted fact or exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration. *Redwine,* 852 S.W.2d at 14. An instruction is also an improper comment on the weight of the evidence if it suggests to the jury the trial judge's opinion concerning the matter about which the jury is asked. *Id.* Whether an instruction is legally correct is a legal question that we review de novo. *See Lee v. Lee,* 47 S.W.3d 767, 790 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

If the charge is legally correct, we review the trial court's definitions, instructions, and questions to the jury for an abuse of discretion. *See Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 664 (Tex.1999). If an instruction is improper, we will reverse if it probably caused the rendition of an improper judgment. *Quantum Chem. Corp. v. Toennies,* 47 S.W.3d 473, 480 (Tex.2001). In determining whether the error is reversible, we examine the entire record. *Id.* (citing *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998)). An improper instruction is especially likely to

cause an unfair trial when "the trial is contested and the evidence is sharply conflicting." *Timberwalk*, 972 S.W.2d at 756 n. 25 (citing *Patterson Dental Co. v. Dunn*, 592 S.W.2d 914, 921 (Tex.1979)).

■ In arguing the instruction was an incorrect statement of the law, PAH relies on a line of authorities construing a conditional tender in the context of the affirmative defense of accord and satisfaction. *See, e.g., Republic Underwriters Ins. Co. v. Mex–Tex, Inc.*, 150 S.W.3d 423 (Tex. 2004); *H.L. "Brownie" Choate, Inc. v. Southland Drilling Co.*, 447 S.W.2d 676 (Tex.1969). Under the doctrine of accord and satisfaction, a tender is conditional if the instrument or any accompanying written communication contains a conspicuous statement to the effect that the instrument, representing a lesser sum than demanded, was tendered in full satisfaction of the claim. *See Milton M. Cooke Co. v. First Bank & Trust*, 290 S.W.3d 297, 303–04 (Tex.App.-Houston [1st Dist.] 2009, no pet.); *Hixson v. Cox*, 633 S.W.2d 330, 331 (Tex.App.-Dallas 1982, writ ref'd n.r.e.). The tender may be rejected; but if it is cashed or deposited, a new contract is created discharging an existing obligation by means of the lesser payment. *See Hixson*, 633 S.W.2d at 331.

BAC argues that PAH's reliance on accord and satisfaction cases is "misplaced" because the "question is not whether [PAH's tender] constituted an accord and satisfaction of [PAH's] obligation to BAC; the question is whether such tender was valid when made." Citing *Weisfeld v. Texas Land Finance Company*, 162 S.W.3d 379, 383 (Tex.App.-Dallas 2005, no pet.), BAC states "a valid tender 'is an *unconditional* offer by a debtor to pay a *sum not less than the full amount due* on a debt or obligation.'" BAC argues that it "was under no obligation to accept" the tender because PAH's check stated it was " 'in full

payment' of [PAH's] obligations to BAC twenty days and then sixty days after BAC first provided the balance" and each time, PAH owed additional sums.

■ The questions before us are whether the tender was conditional and whether the trial court erred by instructing the jury that BAC was not required to accept PAH's check for $46,497.69. Whether a tender is conditional is generally a question of fact. *See Am. Nat'l Ins. Co. v. Gifford–Hill & Co., Inc.*, 673 S.W.2d 915, 921 (Tex.App.-Dallas 1984, writ ref'd n.r.e.) (citing *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex.1969)).

Here, the parties had an ongoing dispute regarding amounts owing under the management agreement. PAH first tendered the $46,497.69 check within thirty days of BAC's November 20 letter demanding that amount and allowing PAH thirty days to pay. PAH's cover letter stated that the check was tendered "in full payment" "pursuant to [BAC's] letter of November 20." Halmos testified he did not agree with the amount claimed and was trying to avoid losing the jet. He wrote "All rights reserved" on the check to protect his rights to straighten the matter out later. BAC's counsel Haynie, on the other hand, testified he did not want to cash the check for fear he was waiving BAC's rights to collect all amounts due from PAH. At the least, the parties had a fact dispute as to the intent and effect of the notations on the check and in the transmittal letter tendering the payment pursuant to BAC's November 20 demand. By determining as a matter of law that PAH's tender was conditional, the trial court removed the fact-finding role from the jury and submitted a legally incorrect instruction. Accordingly, the inclusion of the instruction was error.

■ We next address whether the error resulted in the rendition of an improper judgment. *See Quantum,* 47 S.W.3d at 480. BAC's breach of contract suit alleged PAH and Halmos failed to pay amounts owed in accordance with the management agreement and failed to sign the repurchase documents in accordance with both the management and purchase agreements. The facts were contested and the testimony was conflicting. Over the course of six days, the jury heard the testimony of fifteen witnesses and received over 200 exhibits, consisting of more than 800 pages. Among the witnesses who testified was Needham, BAC's expert on damages. He explained that he had verified BAC's records and confirmed the amounts due as of January 2002; but he agreed on cross-examination that in calculating the amount owed, he did not take into consideration "any credits or issues" Halmos had with any flights or any deposits or refunds due, such as the deposit paid at the time of purchase or for the prorated amount of the January management fees. Needham also agreed that if he took into account the deposit and assumed it could be credited to the outstanding balance, the check PAH tendered would have covered all but $3.23 of the balance due as of January 2002.

At the conclusion of the evidence, the trial court charged the jury pursuant to a twenty-five page document that asked the jury to determine eighteen questions. The verdict was less than unanimous, with only ten jurors finding PAH had breached the management agreement that contained requirements for both payment of fees and repurchase of the jet, but not the purchase agreement that contained only the provision for the repurchase of the jet. By instructing the jury that it could not in effect consider the $46,497.69 tender in determining whether PAH breached the management agreement, the trial court

eliminated the jury's determination of any dispute that the check was a conditional tender. If the question of conditional tender had been submitted to the jury, and the jury determined the check was not intended as "payment in full" of all of PAH's obligations, the jury could have found, considering the conflicting evidence, that no amounts were owing by PAH at the time BAC terminated the agreements. Given the contested issues, conflicting evidence, and less than unanimous verdict, we conclude on this record the jury instruction error probably resulted in the rendition of an improper judgment. We sustain PAH's second issue.

Based on our resolution of PAH's second issue regarding jury charge error, we must reverse and remand the judgment rendered in favor of BAC on its claim PAH breached the management agreement. As a result, we do not reach PAH's issues concerning the damages awarded as a result of the breach, the reconveyance order, and the attorney's fee award. *See* TEX. R.APP. P. 47.1.

### Directed Verdict on PAH's Breach of Contract Counterclaim

■ In PAH's remaining issue, it challenges the trial court's directed verdict on PAH's breach of contract counterclaim. A directed verdict is warranted when the evidence is such that no other verdict can be reached and the moving party is entitled to judgment as a matter of law. *Byrd v. Delasancha,* 195 S.W.3d 834, 836 (Tex. App.-Dallas 2006, no pet.). In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). We will conclude the trial court erred in granting the directed verdict against PAH if PAH produced more than a scintilla of probative evidence to raise a fact issue on the mate-

rial questions presented. *Coastal Transp., Inc. v. Crown Cent. Petrol. Corp.,* 136 S.W.3d 227, 233 (Tex.2004). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id.* (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether more than a scintilla of evidence exists, we view the evidence in the light most favorable to PAH, as the non-movant. *Id.* We credit the favorable evidence if reasonable jurors could, and disregard the contrary evidence unless reasonable jurors could not. *City of Keller,* 168 S.W.3d at 827.

 To establish its breach of contract counterclaim, PAH had to show (1) a valid contract, (2) it performed or tendered performance, (3) BAC breached the contract, and (4) it sustained damages as a result of the breach. *Orix Capital Mkts., L.L.C. v. Wa. Mut. Bank,* 260 S.W.3d 620, 623 (Tex.App.-Dallas 2008, no pet.) (citing *Petras v. Criswell,* 248 S.W.3d 471, 477 (Tex.App.-Dallas 2008, no pet.)). A breach of contract occurs when a party fails or refuses to perform an act that it expressly promised to do. *Id.* (citing *Methodist Hosps. v. Corporate Communicators, Inc.,* 806 S.W.2d 879, 882 (Tex.App.-Dallas 1991, writ denied)). The trial court determines what conduct is required and, if a dispute exists concerning the failure of a party to perform, the trial court submits the disputed fact questions to the jury. *Id.* (citing *ITT Commercial Fin. Corp. v. Riehn,* 796 S.W.2d 248, 253 n. 3 (Tex.App.-Dallas 1990, no writ)).

Applying this standard, we conclude the trial court erred in directing a verdict against PAH on its breach of contract claims. The trial court did not state the basis for its ruling. BAC moved for a directed verdict based on contract disclaimers and lack of evidence of any breach of contract by BAC or damages. We therefore examine first whether more than a scintilla of evidence exists to support PAH's allegations that BAC breached the management agreement. *See* Tex.R. Civ. P. 268 (directed verdict motion shall state specific grounds upon which it is based); *Crown Cent.,* 136 S.W.3d at 234 (examining only directed verdict on subjective element of gross negligence because no challenge to objective element).

PAH's live pleading alleged eleven ways BAC breached the management agreement. Although PAH asserts seven grounds for breach in its appellate brief, only two of those were asserted at trial: (1) failure to provide credits and invoice properly, and (2) premature termination of the management agreement by failing to give PAH thirty days to pay bills and ten days to cure a default, including BAC's rejection of the $46,497.69 check and demand for payment of charges not yet due. The remaining arguments in PAH's brief, such as breach of an obligation to manage the "program" for the benefit of the owners, were never pleaded and PAH did not seek a trial amendment to add those claims. *See* Tex.R. Civ. P. 67 (written pleadings necessary before submission); Tex.R. Civ. P. 278 ("The court shall submit the questions, instructions, and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."); Tex.R. Civ. P. 301 (trial court's judgment must conform to the pleadings). *See also Ex parte Fleming,* 532 S.W.2d 122, 123 (Tex.Civ.App.-Dallas 1975, no writ) ("A court's jurisdiction to render judgment is invoked by pleadings, and a judgment unsupported by pleadings is void."). Accordingly, we address only the allegations of improper billings and wrongful termination, and the record related to those claims.

The record reflects that in accordance with the management agreement, PAH was required to pay a monthly management fee by the first of each month and variable rate fees for flight-related costs within thirty days of invoicing. Under the agreement, PAH was entitled to a ten-day notice-and-cure period for both types of payments. The record shows BAC declared PAH in default for failing to pay certain outstanding bills. The amounts ranged from $46,497.69 on November 20, 2001 to $78,000 on January 4, 2002, the date BAC informed PAH it had seven days to pay or the agreements would be terminated. These amounts included a charge for a fuel stop on a September 2001 flight—a charge both BAC president Keith and BAC counsel Haynie acknowledged was error and entitled PAH to a credit. The outstanding amounts also included fees that were not yet billed, fees not yet due, and fees that had been paid. In addition, the January 4 balance included interest on the $46,497.69 amount Halmos had tendered. According to the testimony of Needham, BAC's expert on damages, if the fees that were not yet due were removed from the January 4 amount and if PAH were credited for (1) a prorated amount of the January management fee based on the date of termination, (2) the fuel stops, and (3) the deposit Halmos paid at the time of purchase, the balance would have been less than $46,000 and would have been covered by the $46,497.69 check. Without prorating the January management fee and without any credits for disputed flights, but applying the deposit as a credit, PAH would have owed $3.23. This evidence raised more than a scintilla of probative evidence as to whether BAC breached the management agreement by improper billings and premature termination. *See, e.g., Neurobehavioral Ass'n, P.A. v. Cypress Creek Hosp., Inc.,* 995 S.W.2d 326, 332 (Tex.App.-Houston [1st Dist.] 1999, no pet.) (contract termination without following thirty-day contractual cure prerequisite was breach).

 We turn next to the question of whether PAH presented more than a scintilla of probative evidence of its damages. The measure of damages for breach of contract is intended to put the complainant in the same economic position had the contract been performed. *Centre Equities, Inc. v. Tingley,* 106 S.W.3d 143, 154 (Tex.App.-Austin 2003, no pet.) (citing *Am. Nat. Petrol. Co. v. Transcon. Gas Pipe Line Corp.,* 798 S.W.2d 274, 278 (Tex. 1990)). Stated differently, the general measure of damages in a breach of contract case is "just compensation for the loss or damage actually sustained." *ExxonMobil Corp. v. Valence Operating Co.,* 174 S.W.3d 303, 316 (Tex.App.-Houston [1st Dist.] 2005, pet. denied) (quoting *Stamp–Ad, Inc. v. Barton Raben, Inc.,* 915 S.W.2d 932, 936 (Tex.App.–Houston [1st Dist.] 1996, no writ) (op. on reh'g)). Damages for loss of use are recoverable where the reasonable value of the use can be established with fair certainty. *Goose Creek Consol. Ind. Sch. Dist. v. Jarrar's Plumbing, Inc.,* 74 S.W.3d 486, 496 (Tex. App.-Texarkana 2002, pet. denied).

Here, PAH presented testimony from Halmos that, because PAH lost use of the jet, he flew charter flights that ranged from $10,595 to $17,519 in cost. This evidence alone constitutes more than a scintilla of probative evidence that PAH suffered direct damages as a result of BAC's alleged breach of the management agreement. *See Luna v. N. Star Dodge Sales, Inc.,* 667 S.W.2d 115, 119 (Tex.1984) (measure of damages for loss of use of property is reasonable cost of renting replacement); *Cessna Aircraft Co. v. Aircraft Network, L.L.C.,* 213 S.W.3d 455, 465 (Tex.App.-Dallas 2006, pet. denied) (award for loss of having aircraft available daily necessarily

include damages for substitute transportation).

Neither direct damages nor BAC's alleged breach of the management agreement by improper billings and wrongful termination was disclaimed by contract language, and BAC does not suggest otherwise. The trial court therefore erred in granting BAC's motion for directed verdict on PAH's breach of contract claims. We sustain PAH's issue one challenging the directed verdict.

### Halmos's Appeal

Halmos's sole issue is that the trial court erred in striking his individual counterclaim filed November 12, 2007 as part of his sixth amended answer. Halmos filed the counterclaim one month before trial and over two years after discovery had closed. The counterclaim included causes of action in Halmos's individual capacity "in the event" the court determined Halmos was the proper party-defendant. He also added a fraud claim on his own behalf, "regardless of who the contracting party [was]," and sought punitive and mental anguish damages. BAC filed a motion to strike the counterclaim, claiming Halmos's individual claims were barred by the statute of limitations and were prejudicial on their face. The trial court granted the motion without specifying the basis for its ruling.

We review a trial court's ruling on amended pleading under an abuse of discretion standard. *Hardin v. Hardin*, 597 S.W.2d 347, 349–50 (Tex.1980). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992).

A party may amend its pleadings up to seven days before trial, or within the time required under a pretrial order. Tex.R. Civ. P. 63; *Hakemy Bros., Ltd. v. State Bank & Trust Co.*, 189 S.W.3d 920, 924 (Tex.App.-Dallas 2006, pet. denied). Such amendments must be filed "at such time as not to operate as a surprise to the opposite party." Tex.R. Civ. P. 63. A trial court has no discretion to refuse an amended pleading unless (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face,[3] and the opposing party objects to the amendment. *Hakemy*, 189 S.W.3d at 924 (citing *State Bar of Tex. v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex.1994); *Greenhalgh v. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990); *G.R.A.V.I.T.Y. Enters. Inc. v. Reece Supply Co.*, 177 S.W.3d

---

**3.** In his reply brief, Halmos challenges BAC's reliance on *Chase Manhattan Mortgage Corp. v. Cook*, 141 S.W.3d 709 (Tex.App.-Eastland 2004, no pet.) and *San Antonio State Hosp. v. Koehler*, 981 S.W.2d 32 (Tex.App.-San Antonio 1998, pet. denied) in support of its argument that the amended counterclaim was prejudicial on its face. Halmos argues that these cases, involving trial amendments under Texas Rule of Civil Procedure 66, are inapplicable to the analysis of a pretrial amendment. Rule 63 covers both trial amendments and pretrial amendments through reference to

pleadings filed "within seven days of trial, or thereafter, or after such time as may be ordered by the judge under rule 166." See Tex.R. Civ. P. 63; *Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 748 (Tex.App.-Dallas 1996, writ denied). Case law concerning the trial court's discretion to allow or strike amended pleadings makes no distinction in the standard to be applied under rules 63 and 66. See *Greenhalgh v. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990).

537, 542 (Tex.App.-Dallas 2005, no pet.)). An amendment that is prejudicial on its face has three defining characteristics: (1) it asserts a new substantive matter that reshapes the nature of trial itself; (2) the opposing party could not have anticipated the new matter in light of the development of the case up to the time the amendment was requested; and (3) the amendment would detrimentally affect the opposing party's presentation of its case. *Smith Detective Agency & Nightwatch Serv., Inc. v. Stanley Smith Sec., Inc.*, 938 S.W.2d 743, 749 (Tex.App.-Dallas 1996, writ denied) (citing *State Bar of Tex.*, 874 S.W.2d at 658; *Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co., Inc.*, 844 S.W.2d 664, 665 (Tex.1992); *Hardin*, 597 S.W.2d at 349). On appeal, the party complaining of the court's ruling bears the burden of demonstrating the court erred. *Hardin*, 597 S.W.2d at 349.

Halmos assigns error to the trial court's ruling for two reasons. First, he questions BAC's use of a motion to strike to dismiss his claims summarily based on a statute of limitations defense. Second, he argues BAC failed to make the required showing of surprise and that the record shows the contrary. Halmos asserts his counterclaim was based on the same facts alleged throughout the case regarding BAC's alleged misrepresentations relating to the jet and the same counterclaims alleged by PAH. He also points to prior deposition questions BAC posed to Halmos regarding the counterclaim and Halmos's answer to questions about his damages, including mental anguish.

In addition to the grounds asserted in its motion to strike, BAC represented to the trial court at the hearing that it had insufficient notice that it would have to defend against Halmos's mental anguish claims at trial and did not have an opportunity to conduct discovery on his individual counterclaim. BAC presented examples of matters it would have pursued, including discovery related to Halmos's susceptibility to mental anguish and facts concerning a flight that transported Halmos's ill father to New York—facts that might substantiate individual claims for fraud, punitive damages, and mental anguish damages, but not corporate claims. BAC also urged the necessity for briefing on potential intervening and superseding causes related to the flight and BAC's conduct.

Based on the record before us, we conclude Halmos has failed to show a clear abuse of discretion by the trial court. Although we agree with Halmos that the facts alleged in the counterclaim did not differ significantly from the facts alleged in the prior counterclaim filed by PAH, that comparison is not determinative. With the amendment adding Halmos as an individual counterplaintiff, the trial court could have concluded this new claimant, alleging personal causes of action, would have reshaped a commercial lawsuit regarding the purchase and use of a jet and related disputed billings. The nature of the trial would have changed substantively to add personal causes of action and damage claims for mental anguish that included Halmos's inability to transport his father for medical treatment. The claims necessarily would have affected BAC's presentation of its case detrimentally, requiring additional discovery and further delay. With discovery closed and a month left before trial, BAC had no opportunity, without a continuance in the case that had already been pending three years, to defend fully against Halmos's claims. To the extent Halmos had ever asserted individual claims, those had been dropped from the case two years earlier and Halmos had never pleaded mental anguish damages. BAC could not have anticipated Halmos's attempt to assert personal claims for damages, given his 2005 exit from the amended pleadings in which only PAH asserted counterclaims. On this record, the trial

court could have rationally concluded the amendment, if allowed, constituted a surprise and was prejudicial on its face. As a result of our conclusion that Halmos has failed to show an abuse of discretion on the issue of surprise or prejudice, we do not reach Halmos's argument concerning limitations. We resolve Halmos's issue against him.

### Conclusion

Having sustained PAH's issues on the directed verdict and the jury instruction on conditional tender, we reverse and remand PAH's and BAC's breach of contract claims as to the management agreement, which include all findings in favor of BAC as to damages, attorney's fees, and reconveyance of the jet. Based on our conclusion that the trial court did not abuse its discretion in granting BAC's motion to strike, we affirm the trial court's order striking Halmos's counterclaim. We affirm the judgment of the trial court in all other respects.