**Affirmed in Part; Reversed in Part and Remanded. Opinion Filed December 31, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-17-00423-CV

### LINDA DICKENS AND DICKENS LAW, LLC, Appellants
### V.
### JASON C. WEBSTER, P.C. D/B/A THE WEBSTER LAW FIRM AND JASON WEBSTER, Appellees

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-02907**

## MEMORANDUM OPINION
Before Justices Stoddart, Whitehill, and Boatright
Opinion by Justice Stoddart

This case concerns a dispute between two lawyers over an agreement to share a contingency fee in a wrongful death case. Jason C. Webster, P.C., d/b/a The Webster Law Firm and Jason Webster, filed this declaratory judgment lawsuit against Linda Dickens and Dickens Law, LLC after a dispute arose over the division of the fee from settlements in the wrongful death case. Webster sought a declaration that he was entitled to the entire contingency fee because any fee sharing agreement with Dickens was unenforceable under the Texas Disciplinary Rules of Professional Conduct. Dickens filed a counterclaim alleging Webster tortiously interfered with her contingency agreement with the client and sought damages for breach of contract and declaratory judgment arguing she was entitled to fifty percent of the contingency fee because the oral fee sharing agreement was enforceable under Kansas law, where the client resides and Dickens

practices. The trial court dismissed Dickens's tortious interference claim based on Webster's motion to dismiss under the Texas Citizens Participation Act (TCPA). On cross motions for summary judgment, the trial court denied Dickens's motion and granted Webster's. The trial court rendered a final judgment dismissing Dickens's counterclaims and declaring that any fee sharing agreement between Webster and Dickens is unenforceable under Texas law.

Dickens raises five issues on appeal: (1) the commercial speech exemption to the TCPA applies and she met her burden under the TCPA if it applies; (2) Kansas law should apply to the fee sharing agreement; (3) the fee sharing agreement should be enforced even if Texas law applies; (4) Texas public policy of protecting the client requires enforcement of the fee sharing agreement; and (5) the trial court erred by striking Dickens's amended counterclaim and third party claim against the client. We conclude the commercial speech exemption does not apply, but that Dickens met her burden under the TCPA to establish by clear and specific evidence a prima facie case for each element of her tortious interference claim. We further conclude Texas law applies to the alleged fee sharing agreement; the fee sharing agreement is not enforceable under Texas law because the client did not consent to the arrangement in writing; public policy does not override the express requirements of the Texas Disciplinary Rules of Professional Conduct; and the trial court did not abuse its discretion by striking the amended counterclaim as untimely. We reverse the orders dismissing Dickens's tortious interference with contract claim and awarding attorney's fees and costs to Webster under the TCPA. In all other respects, we affirm the trial court's judgment. We remand this case for further proceedings on the tortious interference claim.

## BACKGROUND

The client involved in this dispute is Gay Quinn, who lives in Kansas. Her husband, Brian Quinn, worked as a pilot for Federal Express (FedEx). In 2011, Brian was killed when his FedEx plane crashed in Kansas shortly after takeoff. Afterwards, Quinn engaged Dickens to pursue a

workers' compensation claim and to determine the best jurisdiction and venue for pursuing tort remedies. Quinn executed a contingent fee contract with Dickens and a Missouri law firm for handling the workers' compensation claim in January 2012.

Dickens began gathering evidence and investigating the best jurisdiction to bring the tort case "in order to avoid Kansas'[s] harsh damage caps." Dickens determined that Texas was the best jurisdiction in which to file the suit. According to Dickens, she reached an oral contingent fee agreement with Quinn to handle the civil tort claims arising from her husband's death for a fee of 36 percent of the net proceeds if successful in October 2012.[1] Dickens executed a written contingent fee agreement with Quinn regarding the wrongful death case dated March 11, 2015, but there is conflicting evidence whether the agreement was signed on that date or in September 2015. We will refer to this writing as the Dickens Contract.

On November 5, 2013, with the Texas law firm Kelly Hart & Hallman LLP as local counsel, Dickens filed a wrongful death suit in Dallas County, Texas on behalf of Quinn against FedEx and forty-one other defendants who provided service, maintenance, or parts for the crashed aircraft. Dickens was shown as counsel for Quinn in the pleading with attorneys for Kelly Hart listed as local counsel. In connection with the wrongful death case, Dickens alleged she conducted depositions necessary to respond to venue challenges filed by six defendants, served initial disclosure requests, responded to written discovery, dismissed twenty of the original defendants based on a review of maintenance records, interviewed witnesses, collected and stored physical evidence from the crash, accumulated maintenance and engine records, and identified the seven key defendants out of the original forty-two. She retained a general aviation expert and identified

---

[1] Under the Kansas Rules of Professional Conduct, a contingency fee agreement must be in writing and state the method by which the fee is to be determined, including the percentage that accrues to the lawyer in the event of settlement, trial or appeal, and the expenses to be deducted from the recovery. *See* KAN. RULES PROF'L CONDUCT R. 1.5(d); *In re Thomas*, 241 P.3d 104, 110, 114 (Kan. 2010). Dickens asserts that Kansas law does not impose a time limitation on when the agreement is reduced to writing.

other potential experts. Webster disputes the amount of useful work Dickens performed on the case before he became involved.

On August 1, 2014, Dickens filed a motion for admission pro hac vice in the Texas wrongful death lawsuit. In her application, Dickens stated she was familiar with the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Profession Conduct and agreed to abide by and comply with those rules in connection with the Texas proceeding. The record does not indicate that the trial court ruled on the motion.

In January 2015, Dickens began looking for another lawyer to "joint venture" the case with due to her increased case load. She met with Webster, a Houston attorney, on January 5, 2015 at her office in Kansas. Webster discussed the case, reviewed portions of the file, and developed a list of things to do in the case. According to Dickens, she made an oral agreement with Webster before he left her office that Webster and his associate, Heidi Vicknair, would assume all work on the case and "fund all future lawsuit expenses in return for a fifty-fifty split of the attorney's fees, contingent upon Gay Quinn's approval." Dickens met with Quinn on January 8, 2015 and obtained her consent to Webster taking over the case under a fifty-fifty fee sharing agreement, with Webster funding all future litigation expenses. According to Webster, he never reached an agreement orally or in writing regarding a referral fee for the wrongful death case. He offered Dickens different fee arrangements, but she rejected those offers.

Webster stated in his affidavit that he agreed to make an appearance in the wrongful death case on behalf of Quinn and discussed a fee sharing agreement with Dickens based on her representation that she had a contingent fee agreement with Quinn and had performed a substantial amount of work on the case and retained experts. He proposed that they would split the attorney's fees and all expenses going forward. He told Dickens he wanted a signed agreement and his office would send one reflecting their discussion. He also informed her that Quinn needed to approve

–4–

any fee sharing agreement in writing as required by Texas law.

After the January 5, 2015 meeting, Webster and Dickens exchanged phone calls and e-mails regarding the fee sharing proposals and transferring the file to Webster. In late January, Dickens proposed giving Webster a larger share of the fee if he would repay the expenses she had already paid. After reviewing the list of expenses provided by Dickens, which included hourly fees for Kelly Hart, Webster responded that he could not reimburse those attorney's fees as part of the expenses in the case. He proposed a "55/45 split" of the contingency fee and he would reimburse her for her expenses other than the fees paid Kelly Hart. Webster sent a draft fee sharing agreement reflecting this proposal, but Dickens rejected it. In a February 3, 2015 e-mail, Dickens stated she would "pursue borrowing against those expenses on my own, and stay with the 50/50." Webster replied, "No problem let's move forward."

Meanwhile, Dickens delivered the physical file to Webster, prepared and filed a response to a pending motion to transfer venue, and forwarded a motion for substitution of Webster as counsel for Quinn to Kelly Hart for filing. The trial court signed an order allowing the Kelly Hart attorneys to withdraw and Webster to substitute as counsel for Quinn on February 3, 2015.

On February 10, 2015, Webster sent a draft fee-sharing agreement to Dickens providing that each attorney would fund fifty percent of the expenses for the case and receive fifty percent of the contingent fee for the case. Dickens rejected this agreement, stating she thought the agreement was that Webster would fund all future expenses because she had spent over $57,000 on the case and then they would share the fee "50/50."

In early April 2015, Webster prepared a contingent fee contract between Webster and Dickens as the attorneys and Quinn as the client. This contract provided for the sharing of the fee between Dickens and Webster, but left the actual percentages blank because of the ongoing negotiations between the attorneys. Vicknair traveled to Kansas to meet with Quinn about the case

on April 2, 2015. During the meeting, it became apparent that Quinn had not signed a contingent fee contract with Dickens for the wrongful death case. Quinn and Webster signed the contract, but not Dickens. The blanks for the percentages of the fee sharing between Webster and Dickens were never completed. We will refer to this writing as the Webster Contract.

Webster prosecuted the case on behalf of Quinn and reached a settlement with several defendants in December 2015. When Dickens learned of the potential settlement, she contacted Webster about settling the fee sharing issue. Webster disagreed with Dickens's representation about a fee sharing agreement, but offered to meet with her to resolve the issue. No meeting took place, however. In January 2016, Dickens contacted the settling defendants and asserted an attorney's fee lien against the settlement proceeds. On January 20, 2016, Quinn terminated Dickens as her counsel.

After the partial settlement closed in January 2016, Webster filed a motion to allocate 100 percent of the attorney's fees to him and 0 percent to Dickens. The trial court granted the motion. Quinn reached a settlement with the remaining defendant in February 2016. Dickens again demanded her share of the attorney's fees and expenses from the settlements of the wrongful death case. Webster paid Dickens only the portion of her expenses other than the attorney's fees she paid to Kelly Hart.

Webster filed this declaratory judgment case against Dickens on March 11, 2016. He sought declarations that any alleged fee sharing agreement between he and Dickens was unenforceable. Dickens answered and filed a counterclaim alleging causes of action for breach of a fee sharing agreement, tortious interference with an existing contract between Dickens and the client, and a declaratory judgment that the fee sharing agreement was enforceable. Dickens alleged that Webster tortiously interfered with her contingent fee agreement with Quinn by making "false and defamatory statements to Quinn about Dickens," including:

a. That Dickens['s] contract with Quinn was "no good" in Texas;

b. That Dickens was attempting to collect monies from Quinn that Dickens was not entitled to;

c. That Dickens had mishandled Quinn's case;

d. That Dickens was not a trial attorney and did not know what she was doing;

e. That Dickens made statements about her work on the case which were not true;

f. That Dickens breached her agreement with Webster;

g. That Quinn owed Dickens nothing and Dickens'[s] attempts to collect fees were "a joke;" and

h. That Quinn should terminate Dickens from representing her in the Lawsuit.

Webster filed a motion to dismiss the tortious interference claim under the TCPA, which the trial court granted. Thereafter, Dickens filed a motion for summary judgment on her breach of contract claim. In her reply to Webster's response, Dickens argued for the first time that Kansas law should apply to the fee sharing agreement rather than Texas law. Webster then filed a motion for application of Texas law and for traditional summary judgment that any fee sharing agreement with Dickens was unenforceable.

The day of the hearing on Webster's motion for summary judgment, Dickens filed an amended counterclaim adding new claims against Webster and a third party claim against Quinn for quantum meruit. Webster filed an objection to the amended counterclaim and third party claim as untimely. After the hearing, the trial court signed an order granting Webster's motion, expressly stated the court did not consider the first amended counterclaim and third party claim which was untimely, dismissed Dickens's counterclaims with prejudice, and rendered a declaratory judgment that any fee sharing agreement between Webster and Dickens was unenforceable under Texas law. The trial court later struck the first amended counterclaim and third party claim and rendered a final judgment on the same terms as the order on Webster's motion for summary judgment.

DISCUSSION

## A. TCPA

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky*, 460 S.W.3d 579, 584 (Tex. 2015) (orig. proceeding). That protection comes in the form of a motion to dismiss for "any suit that appears to stifle the defendant's" exercise of those rights. *Id.* Reviewing a TCPA motion to dismiss requires a three-step analysis. *Youngkin v. Hines*, 546 S.W.3d 675, 679–80 (Tex. 2018). Initially the moving party must show by a preponderance of the evidence that the TCPA applies to the legal action against it, meaning, the legal action is based on the exercise of the rights as defined in the TCPA. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(b). If the movant meets its burden, the nonmoving party must establish by clear and specific evidence a prima facie case for each essential element of its claim. *Id.* § 27.005(c). If the nonmoving party satisfies that requirement, the burden shifts back to the movant to prove each essential element of any valid defenses by a preponderance of the evidence. *Id.* § 27.005(d). The non-movant may also show that one of several exemptions to the TCPA apply, such as the commercial speech exemption. *See id*. § 27.010(b).

We review de novo the trial court's determinations that the parties met or failed to meet their burdens of proof under section 27.005. *Campbell v. Clark*, 471 S.W.3d 615, 623 (Tex. App.—Dallas 2015, no pet.). We also review de novo questions of statutory construction. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam).

### 1. Exercise of Protected Right

The TCPA does not require the communication be made publically. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) ("we determined that the TCPA's plain language does not require communication in public form"); *LegacyTexas Bank v. Harlan*, No. 05-

18-00039-CV, 2018 WL 2926397, at *2 (Tex. App.—Dallas June 7, 2018, no pet.) (mem. op.). The TCPA defines the exercise of the right of free speech as a communication made in connection with a matter of public concern. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(3). A matter of public concern includes an issue related to a good, product, or service in the marketplace. *Id.* § 27.001(7)(E).

We agree with the trial court's determination that the alleged statements were an exercise of the right of free speech or to petition within the expansive definition of those terms under the TCPA. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 894 (Tex. 2018) (free speech); *Youngkin*, 546 S.W.3d at 680 (right of petition). Webster's alleged communications to Quinn were made in connection with a matter of public concern under this definition—namely, Dickens's services in the marketplace. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(7)(E). The communications also fall easily within the definition of the exercise of the right to petition, which is defined as a communication in or pertaining to a judicial proceeding. TEX. CIV. PRAC. & REM. CODE ANN. § 27.001(4)(A)(i). Dickens does not challenge this conclusion.

### 2. Commercial Speech Exemption

Dickens's primary argument is that the TCPA does not apply because this case falls within the commercial speech exemption to the act. The TCPA does not apply

> to a legal action brought against a person primarily engaged in the business of selling or leasing goods or services, if the statement or conduct arises out of the sale or lease of goods, services, or an insurance product, insurance services, or a commercial transaction in which the intended audience is an actual or potential buyer or customer.

*Id.* § 27.010(b).

The supreme court recently established a four part test for application of the commercial speech exemption:

> (1) the defendant was primarily engaged in the business of selling or leasing goods,
> (2) the defendant made the statement or engaged in the conduct on which the claim

–9–

is based in the defendant's capacity as a seller or lessor of those goods or services, (3) the statement or conduct at issue arose out of a commercial transaction involving the kind of goods or services the defendant provides, and (4) the intended audience of the statement or conduct were actual or potential customers of the defendant for the kind of goods or services the defendant provides.

*Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 688 (Tex. 2018) (per curiam). The court explained that the statute's reference to "the sale or lease of goods or services," read in context, "must refer to *the defendant's* sale or lease of goods or services." *Id*. In contrast, the exemption does not apply and a seller of goods or services may avail himself of the TCPA, "when he speaks of *other goods or services* in the marketplace." *Id*. at 689 (emphasis added).

In this case, we focus on the exemption's requirement that the statement or conduct arise out of the sale or lease of goods or services and the third element of the *Castleman* test. For the exemption to apply, the defendant's statement or conduct must be about the defendant's goods or services, not the plaintiff's. *See Castleman*, 546 S.W.3d at 688–89; *Glob. Tel\*link Corp. v. Securus Techs., Inc.*, No. 05-16-01224-CV, 2017 WL 3275921, at \*2, \*4 (Tex. App.—Dallas July 31, 2017, pet. dism'd) (e-mails about plaintiff's services did not arise out of sale of either defendant's or plaintiff's goods or services); *MacFarland v. Le–Vel Brands LLC*, No. 05-16-00672-CV, 2017 WL 1089684, at \*9 (Tex. App.—Dallas Mar. 23, 2017, no pet.) (mem. op.) (exemption not met because statement "not about" defendant's business of selling services); *Moldovan v. Polito*, No. 05-15-01052-CV, 2016 WL 4131890, (Tex. App.—Dallas Aug. 2, 2016, no pet.) (mem. op.) (internet posts were not exempted from TCPA's protections because they were not about the defendant's business); *Toth v. Sears Home Improvement Products, Inc.*, 557 S.W.3d 142, 154 (Tex. App.—Houston [14th Dist.] 2018, no pet.) ("Even before *Castleman*, courts have held that the exemption is not established unless the challenged statement was "about" the speaker's particular goods or services, or the speaker's business of selling them."); *Kinney v. BCG Attorney Search, Inc.*, No. 03-12-00579-CV, 2014 WL 1432012, at \*6–7 (Tex. App.—Austin Apr.

11, 2014, pet. denied) (mem. op.) (exemption did not apply because comments made no reference whatsoever to defendant's business or the sale of his services).

Dickens alleged that Webster tortiously interfered with her contract with Quinn by making false and defamatory statements about Dickens to Quinn. Specifically, she alleged Webster falsely stated:

a. That Dickens['s] contract with Quinn was "no good" in Texas;

b. That Dickens was attempting to collect monies from Quinn that Dickens was not entitled to;

c. That Dickens had mishandled Quinn's case;

d. That Dickens was not a trial attorney and did not know what she was doing;

e. That Dickens made statements about her work on the case which were not true;

f. That Dickens breached her agreement with Webster;

g. That Quinn owed Dickens nothing and Dickens'[s] attempts to collect fees were "a joke;" and

h. That Quinn should terminate Dickens from representing her in the Lawsuit.

These statements all concern Dickens's services to or contract with Quinn. They do not concern or arise out of Webster's services. Accordingly, Dickens failed to show that Webster's alleged statements or conduct arose out of the sale or lease of goods or services under the terms of the commercial speech exemption. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 27.010(b); *Castleman*, 546 S.W.3d at 688–89. We conclude that the TCPA applies to Dickens's tortious interference counterclaim.

### 3.      Prima Facie Case

Because the TCPA applies, the burden shifted to Dickens to establish by clear and specific evidence a prima facie case for each essential element of her claim. TEX. CIV. PRAC. & REM. CODE ANN. § 27.005(c). In determining whether to dismiss the legal action under the TCPA, the court is to consider the pleadings and supporting and opposing affidavits stating the facts on which the

liability or defense is based. *Id*. § 27.006(a).

A "prima facie case" refers to "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Lipsky*, 460 S.W.3d at 590. It is the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *Id*. (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)). "Clear and specific evidence" of each essential element of a claim is more than "mere notice pleading." *Id*. A plaintiff must "provide enough detail to show the factual basis for its claim." *Id*. at 590–91. The TCPA's requirement of proof by clear and specific evidence does not "impose an elevated evidentiary standard," does not "categorically reject circumstantial evidence," and does not "impose a higher burden of proof than that required of the plaintiff at trial." *Id*. at 591.

To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss. *Cmty. Health Sys. Prof'l Services Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). Interference with a contract is tortious only if it is intentional. *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992). Intentional interference does not require intent to injure, only that "the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it." *Id*. (citation omitted). There must be direct evidence of a willful act of interference. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993). The interfering party must know of the existence of a contract between the plaintiff and a third party or have knowledge of facts that would lead a reasonable person to conclude that a contract existed. *Exxon v. Allsup*, 808 S.W.2d 648, 656 (Tex. App.—Corpus Christi 1991, writ denied).

In response to the motion to dismiss, Dickens submitted her affidavit with several documents and e-mails attached. Webster did not submit an affidavit with his motion or reply.

Dickens testified she entered into a contingent fee contract with Quinn for a 36 percent contingent fee from the net recovery in the wrongful death case. She attached the Dickens Contract dated March 11, 2015 to her affidavit.[2]

Dickens argues Webster interfered with her contract with Quinn by presenting Quinn with a new contingent fee contract on April 2, 2015 when he knew Quinn already had a contract with Dickens. Dickens testified:

> On or about April 2, without my knowledge, Webster's associate, Heidi Vicknair, flew to Kansas and met with Quinn in her home. Quinn signed a new contract with Webster's firm which stated that it "superseded all prior contracts" and failed to disclose that Dickens Law firm was due any legal fees generated. Four months later Quinn told me Vicknair had gotten her to sign a new contract with the Webster firm by telling her that her contract with Dickens Law was "no good". Vicknair subsequently copied me on an email she sent Quinn which explained that she had obtained the contract from Quinn because my contingent fee agreement was "unconscionable" in Texas and did not comply with Texas's ethical requirements.

Dickens attached the Webster Contract to her affidavit. That contract states it was made between Quinn as the client and Webster and Dickens as the attorneys. It is signed by Quinn and Webster, but Dickens's signature line is blank. The Webster Contract provides in part: "This Agreement constitutes the sole and only Agreement of the parties hereto and supersedes any prior understandings or written or oral agreement between the parties respecting the within subject matter."

As additional evidence of willful and intentional interference, Dickens attached an e-mail she received from Webster on December 31, 2015. She testified this e-mail made "numerous false

---

[2] Webster contends there is evidence Quinn did not sign the contract until September 2015 based on e-mails between Quinn and Dickens attached to affidavits filed in connection with the motions for summary judgment. However, this evidence was submitted after the trial court ruled on the motion to dismiss and therefore was not before the court at the time.

and defamatory statements" about her and was "forwarded to Quinn." The e-mail, however, does not indicate it was copied to Quinn. Webster stated in the e-mail:

> Linda,
>
> None of that is true. You have not held up your end or done a bit of work. You put up no expenses and we had to clean up a major mess you created before we could even get started on substantive work on the case. You misrepresented the condition of the case and the work required. You had no experts retained, you were sanctioned before the court and you were never even properly admitted to represent her. Nor did you have a contract to file suit on her behalf to begin with as per Texas law. You refused to sign the agreement I sent after the meeting. I am sick of your bullshit made up allegations against me and my firm. I will not split fees with you on a 50/50 basis.
>
> We have always had a 36 percent contract with Gay. Where you get 40 percent is beyond me. If you knew anything at all about being a personal injury trial lawyer or this case you would have not done or said any of the things you have so far. We have a contract we intend to abide by with her. She is in agreement and you are unethically subjecting her to a lawsuit for breach of contract by the defendants based upon your own greed. I have been nice. I am trying to work this out. I will ask you once again to meet in Dallas. You cannot ethically hold up her settlement or the release being signed. This is not her issue and she should not be pulled in all these directions. I have personally spoken to her on several occasions. Once she signs the release, we will pay her the money. You and I can meet in Dallas to work out our issues. They have nothing to do with Gay or her money. Enough is enough.
>
> So stop sending emails and harassing Gay for your means. Send me dates you can meet.

On January 13, 2016, Dickens texted Quinn: "What on earth have they said to you to make you think I am not 600 percent behind you?" Quinn replied: "Nothing but the scathing e-mail Jason [Webster] sent you!" On January 19, 2016, Dickens e-mailed all attorneys in the wrongful death case claiming an attorney's lien against all proceeds of the settlements and demanded to be named as a joint payee on all settlement checks. The next day, she received a letter from Quinn stating:

> Based upon your actions and interference with the pending settlement, I am no longer in need of your services. Please forward any remaining file materials in your possession to me. I do not need your assistance with any part of my case any longer. Your service are hereby terminated.

Dickens testified she "was later told by Jason Webster that he had instructed Quinn to terminate

–14–

me."

Dickens attached to her affidavit copies of a motion to allocate attorney's fees filed by Webster in the wrongful death case on January 25, 2016 and the trial court's February 2, 2016 order granting that motion. The order allocates 100 percent of the attorney's fees from the settlements to Webster.

Based on this evidence, Dickens contends she met her burden to establish by clear and specific evidence a prima facie case for each essential element of her tortious interference claim. Given Dickens's uncontroverted affidavit and the circumstantial evidence on file at the time of the hearing on the motion to dismiss, we agree. Dickens presented clear and specific evidence of a written contingent fee contract with Quinn dated March 11, 2015. She also presented evidence that Webster obtained a new contingent fee contract on April 2, 2015 between Quinn and both Webster and Dickens, but without Dickens's signature, that superseded prior agreements with respect to the subject matter. Dickens presented evidence that Webster's associate later told Quinn that the Dickens Contract was "no good," unconscionable, and did not comply with Texas ethical requirements. Dickens testified that Webster's December 31, 2015 e-mail was forwarded to Quinn and there is evidence that Webster's "scathing e-mail" caused Quinn to believe that Dickens was not "600 percent behind" her. Quinn later terminated Dickens and there is evidence Dickens received no attorney's fees from the settlement of the wrongful death case. *See S & S Emergency Training Sols., Inc. v. Elliott*, No. 17-0628, 2018 WL 6711322, at *3 (Tex. Dec. 21, 2018) ("Direct evidence of damages is not required, but the evidence must be sufficient to allow a rational inference that some damages naturally flowed from the defendant's conduct."). This evidence is more than "mere notice pleading" and provides sufficient detail to show the factual basis for Dickens's claim. *See Lipsky*, 460 S.W.3d at 590–91. We conclude the evidence is clear and specific and supports a rational inference that the alleged facts are true. Such evidence is sufficient

–15–

to establish the given facts if not rebutted or contradicted. *Id*. We conclude Dickens established by clear and specific evidence a prima facie case for each essential element of her claim for tortious interference with contract.

Webster argues for the first time on appeal that he established by a preponderance of the evidence the essential elements of the defenses of justification and attorney immunity. However, neither of these defenses were presented to the trial court or Dickens at the time of the ruling on the motion to dismiss. We will not affirm a trial court's ruling based on a legal theory never presented to the trial court and to which the opposing party had no opportunity to respond. *See Holland v. Friedman & Feiger*, No. 05-12-01714-CV, 2014 WL 6778394, at *9 (Tex. App.—Dallas Dec. 2, 2014) (mem. op., not designated for publication) (rejecting attorney immunity defense raised by appellees for the first time on appeal); *see also Tatum v. Hersh*, 559 S.W.3d 581, 585 (Tex. App.—Dallas 2018, no pet.); *Victoria Gardens of Frisco v. Walrath*, 257 S.W.3d 284, 289–90 (Tex. App.—Dallas 2008, pet. denied). Because these defenses were not raised in the trial court, we may not consider them for the first time on appeal.

### 4. Conclusion

We conclude the trial court erred by granting the motion to dismiss Dickens's tortious interference with contract claim. We sustain Dickens's first issue.

## B. Fee Sharing Agreement

In her second, third, and fourth issues, Dickens challenges the trial court's granting of Webster's motion for summary judgment and denial of her motion. She contends the trial court erred by applying Texas law to the alleged fee sharing agreement, the fee sharing agreement is enforceable under Texas law, and that Texas public policy favors enforcement of the agreement.

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A party moving for traditional summary judgment has

the burden to prove that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When both parties move for summary judgment and the trial court grants one motion and denies the other, as here, we review both sides' summary judgment evidence and render the judgment the trial court should have rendered. *S. Crushed Concrete, LLC v. City of Houston*, 398 S.W.3d 676, 678 (Tex. 2013); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

### 1.    Choice of Law

We apply our choice of law analysis to the contract at issue in this case—the alleged fee sharing contract between Dickens, a Kansas lawyer, and Webster, a Texas lawyer, regarding the contingent fee from the recovery in the Texas wrongful death case.

A choice of law analysis begins by determining whether there is an actual conflict of laws. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). Texas law has several requirements for the division of a fee between lawyers who are not in the same firm:

> (f) A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if:
>
>> (1) the division is:
>>
>>> (i) in proportion to the professional services performed by each lawyer; or
>>>
>>> (ii) made between lawyers who assume joint responsibility for the representation; and
>>
>> (2) the client consents in writing to the terms of the arrangement prior to the time of the association or referral proposed, including:

–17–

> (i) the identity of all lawyers or law firms who will participate in the fee-sharing agreement, and
>
> (ii) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation, and
>
> (iii) the share of the fee that each lawyer or law firm will receive or, if the division is based on the proportion of services performed, the basis on which the division will be made; and
>
> (3) the aggregate fee does not violate paragraph (a).
>
> (g) Every agreement that allows a lawyer or law firm to associate other counsel in the representation of a person, or to refer the person to other counsel for such representation, and that results in such an association with or referral to a different law firm or a lawyer in such a different firm, shall be confirmed by an arrangement conforming to paragraph (f). Consent by a client or a prospective client without knowledge of the information specified in subparagraph (f)(2) does not constitute a confirmation within the meaning of this rule. No attorney shall collect or seek to collect fees or expenses in connection with any such agreement that is not confirmed in that way, except for:
>
> (1) the reasonable value of legal services provided to that person; and
>
> (2) the reasonable and necessary expenses actually incurred on behalf of that person.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), (g), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Tex. State Bar R. art. X, § 9). Kansas law, on the other hand, provides:

> A division of fee, which may include a portion designated for referral of a matter, between or among lawyers who are not in the same firm may be made if the total fee is reasonable and the client is advised of and does not object to the division.

KAN. R. PROF'L CONDUCT R. 1.5(g). Kansas rule 1.5(g) lists two requirements for a division of a fee between lawyers: (1) the client is advised and does not object; and (2) the total fee is reasonable. *Ryder v. Farmland Mut. Ins. Co.*, 807 P.2d 109, 116 (Kan. 1991). The rule "eliminates the requirement that the division of fees be made in proportion to the services performed and the responsibility assumed for the representation." *Id*. The rule does not require disclosure to the client of the share that each lawyer is to receive. *Id*. (citing comment to rule 1.5(g)). We agree with the parties that the laws of Texas and Kansas conflict on the requirements for a fee sharing

–18–

contract between attorneys in different firms.

Dickens does not contend the parties agreed on the applicable law for the alleged fee sharing agreement. Therefore, we must determine which state has the most significant relationship to the transaction and the parties using the principles stated in the sections 6 and 188 of the Restatement of Conflict of Laws. *See Sonat Expl. Co.*, 271 S.W.3d at 231; RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 188. Section 188 lists five contacts to consider in applying the principles listed in section 6 of the Restatement: (a) the place of contracting, (b) the place of negotiation, (c) the place of performance, (d) the location of the subject matter, and (e) the domicile, place of incorporation, and place of business of the parties. *Sonat Expl. Co.*, 271 S.W.3d at 233; RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(2). The general choice of law principles identified in section 6 of the Restatement include a consideration of the policies and interests of the respective forums, the protection of the "justified expectations" of the parties, the policies underlying the particular field of the law at issue, certainty, predictability, and uniformity of result, and the ease in the determination and application of the law to be applied. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6.

Dickens focuses her choice of law analysis on her contingent fee contract with Quinn. She argues the court cannot apply Texas law regarding fee sharing contracts to the contingent fee contract between Dickens and Quinn, two Kansas residents. But that is not the contract that is the subject of this lawsuit. Webster sued Dickens for a declaratory judgment that the alleged fee sharing contract between them was unenforceable. Dickens counterclaimed against Webster for breach of the same alleged fee sharing contract and for a declaratory judgment that the fee sharing contract is enforceable. The issue before us is what law applies to the fee sharing contract between the attorneys, not the contingent fee contract with the client.

Turning to the alleged fee sharing agreement, the evidence is conflicting as to the place of

negotiation and contracting. Dickens alleged an oral contract was negotiated and formed in her office in Kansas on January 5, 2015. Webster denies that any contract was formed, and points to his written offers sent from Texas to Dickens in Kansas which were rejected by Dickens. We accept Dickens's allegations that the alleged contract was negotiated and formed in Kansas for purposes of our analysis. But, because Dickens sought to engage a Texas attorney to conduct the Texas litigation, the place of negotiation and contracting is not a significant contact in this case. *See Sonat Expl. Co.*, 271 S.W.3d at 233. The domicile and place of business of the parties is clear, but balances out because Webster is in Texas and Dickens is in Kansas. This contact is not particularly helpful in this case. *See id.*

The subject matter of the contract and the place of performance of the alleged contract are significant contacts in this case. The subject matter of the contract is the division of a contingent fee arising from the successful litigation of the wrongful death claims in the Texas court. The place of the performance is also in Texas, where the litigation was filed by Dickens, where Webster was to render legal services, where he received the settlement proceeds, and where he would disburse those proceeds to the client and Dickens if necessary. The focus of the alleged contract was the successful prosecution of the Texas litigation so that there would be a fee to share. Without that, neither attorney would be entitled to a fee.

The general choice of law factors also favor Texas. Both states have different policies regarding the division of fees between lawyers who are not in the same firm, but the fees at issue in this case are fees generated from litigation in Texas, not Kansas. Texas, more so than Kansas, has a significant interest in attorney's fees generated from litigation in Texas courts. Considering the relevant factors from sections 6 and 188 of the Restatement, the most reasonable conclusion is that parties contracting to share the fee generated by successful litigation in Texas courts would justifiably expect Texas law to govern that contract. *See Sonat Expl. Co.*, 271 S.W.3d at 234–35

–20–

(noting that protection of justified expectations is one of the most significant factors under section 6 in contract cases). The services necessary to obtain a recovery from which the client would be compensated for her injury and the attorneys would be paid, were to be performed in Texas. We conclude Texas has the most significant relationship to the alleged agreement to share attorney's fees from the Texas litigation.

Dickens argues she is not subject to the Texas disciplinary rules because the trial court never expressly granted her motion for admission pro hac vice. However, Dickens's counterclaim alleges she practiced law in Texas representing Quinn regardless of the status of her motion for admission pro hac vice. She alleged: "Dickens filed suit on Quinn's behalf in Dallas County, Texas"; she prepared and filed a response to a venue challenge; and "argued for Quinn before this Court." In addition, Dickens signed pleadings and motions in the wrongful death case as an attorney for Quinn along with local counsel. We find her contention that she is essentially a stranger to practicing law in Texas and not subject to the Texas disciplinary rules disingenuous. Indeed, it is tantamount to an admission of engaging in the unauthorized practice of law in Texas. *See* TEX. GOV'T CODE ANN. § 81.102(a) (except for rules prescribing the limited practice of law by attorneys licensed in another jurisdiction, "a person may not practice law in this state unless the person is a member of the state bar"); *id*. § 81.101(a) (defining practice of law as the preparation of pleadings or other documents incident to a proceeding on behalf of a client before a judge in court or rendering any service requiring the use of legal skill or knowledge); TEX. RULES GOVERN. BAR ADM'N R. 19. We conclude, however, that by permitting Dickens to appear in the case and represent her client after the filing of the motion for admission pro hac vice, the trial court impliedly granted the motion. In any event, this is not a disciplinary proceeding against Dickens. This is a contract dispute and the question is whether the alleged contract is enforceable.

We conclude the trial court correctly determined that Texas law applies to the alleged fee

sharing agreement between Dickens and Webster for the division of the contingent fee from the recovery in the Texas wrongful death lawsuit.

### 2. Fee Sharing Agreements Under Texas Law

Although the Texas Disciplinary Rules of Professional Conduct "do not define standards of civil liability of lawyers," courts look to the Disciplinary Rules for guidance when determining whether a specific situation violated the public policy protections embodied in the Disciplinary Rules. *See Royston, Rayzor, Vickery, & Williams, LLP v. Lopez*, 467 S.W.3d 494, 503 (Tex. 2015); *Douglas–Peters v. Cho, Choe & Holen, P.C.*, No. 05-15-01538-CV, 2017 WL 836848, at *20 (Tex. App.—Dallas Mar. 3, 2017, no pet.) (mem. op.); *see also* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT preamble: scope ¶ 15 ("These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached."). A court may deem the disciplinary rules to be an expression of public policy such that a contract violating them is unenforceable as against public policy. *Cruse v. O'Quinn*, 273 S.W.3d 766, 775 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 563 (Tex. 2006) (concluding the law firm's contingent fee contract's "termination fee provision violates public policy and is unconscionable as a matter of law").

The Texas Disciplinary Rules were revised in 2005 to address the issue of referral fees. *See* 68 TEX. B.J. 202 (2005). The Texas rule requires, among other things, that an arrangement to share fees between lawyers who are not in the same firm may be made only if the client consents in writing to the terms of the arrangement before the time of the referral including the identity of all lawyers who will participate in the fee sharing agreement, basis for the division of the fee, and the share each lawyer will receive. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f). Consent by a client without knowledge of the information required by subparagraph (f)(2) of rule

1.04 does not constitute a valid confirmation within the meaning of the rule. *Id*. 1.04(g). "No attorney shall collect or seek to collect fees or expenses in connection with any such agreement that is not confirmed in that way." *Id*.

Even before the amendments to rule 1.04 in 2005, Texas law was clear: "A fee sharing agreement between lawyers who are not in the same firm violates public policy and is unenforceable unless the client is advised of and consents to the sharing arrangement." *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 205 (Tex. 2002). The 2005 amendment requires more than client advisement and consent: the client must consent in writing before the association or referral and after being advised of the identity of all attorneys sharing in the fee, the basis on which the fee will be shared, and share of the fee each lawyer will receive. *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), (g). A fee sharing agreement between lawyers who are not in the same firm that does not satisfy the requirements of rule 1.04(f) "violates public policy and is unenforceable." *Johnson*, 73 S.W.3d at 205; *see also* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), (g).

Dickens alleged and presented evidence she entered into an oral fee sharing agreement with Webster that was later confirmed by him in an e-mail. She also alleged that she discussed the fee sharing arrangement with Quinn on January 8, 2015. However, there is no evidence that Quinn consented to the arrangement in writing before the association or referral and after being advised of the specific information required by Rule 1.04(f)(2). Thus, alleged fee sharing agreement, regardless of the exact terms as to the sharing of fees and expenses, fails to satisfy the public policy expressed in Rule 1.04(f) and (g). TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), (g).

Dickens argues the public policy of protecting the client requires enforcement of the fee sharing agreement. We disagree. The public policy regarding fee sharing agreements between attorneys in different firms is expressed in Rule 1.04(f) and (g). Further, the supreme court has

recognized that a fee sharing agreement that does not comply with the Disciplinary Rules is unenforceable even under the more lenient prior rules. *See Johnson*, 73 S.W.3d at 205. While protecting clients is an important consideration in the law, the supreme court, exercising its rule making power, has determined that clients are best protected by fee sharing agreements between attorneys that comply with the requirements of Rule 1.04(f) and (g). *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 1.04(f), (g).

### 3.    Conclusion

Texas law applies to the alleged fee sharing agreement between Webster and Dickens. That alleged agreement, however, fails to comply with the requirement that the client consent in writing before the association or referral and after being advised of the information required by Rule 1.04(f)(2). Therefore, the oral fee sharing agreement violates public policy and is unenforceable. We conclude the trial court properly granted Webster's motion for summary judgment and denied Dickens's motion. We overrule Dickens's second, third, and fourth issues.

### C. Pleading Amendment

In her fifth issue, Dickens argues the trial court abused its discretion by striking her first amended counterclaim filed the morning of the summary judgment hearing. Without leave of court, Dickens filed a first amended counterclaim and third party claim, in which she sought to add new causes of action against Webster and to join Quinn as a third-party defendant on a quantum meruit cause of action. The amended pleading was submitted electronically the evening before the hearing on Webster's motion for summary judgment and filed the next morning. Webster objected to the amended counterclaim and moved to strike it as untimely. The trial court's order on the motion for summary judgment stated the court did not consider Dickens's amended counterclaim, which was untimely. The trial court struck the amended counterclaim in a later order.

Dickens argues the trial court erred by striking the amended counterclaim because Webster's motion was for partial summary judgment. She cites no authority that a hearing on a motion for partial summary judgment is not a trial within the meaning of rule 63.

We review a trial court's ruling on an amended pleading under an abuse of discretion standard. *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 622–23 (Tex. App.—Dallas 2010, no pet.). A party may amend or respond to pleadings "at such times not to operate as a surprise to the opposite party." TEX. R. CIV. P. 63. But any pleadings filed within seven days of the date of trial or thereafter shall be filed only with leave of the court. *Id.* A judge shall grant such leave unless there is a showing that such a filing will operate as a surprise to the opposite party. *Id.* A trial court has no discretion to deny leave to amend unless (1) the party opposing the amendment presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *State Bar v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994) (per curiam); *Greenhalgh v. Serv. Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex. 1990); *G.R.A.V.I.T.Y . Enters., Inc. v. Reece Supply Co.*, 177 S.W.3d 537, 542 (Tex. App.—Dallas 2005, no pet.). An amendment that is prejudicial on its face has three defining characteristics: (1) it asserts a new substantive matter that reshapes the nature of trial itself; (2) the opposing party could not have anticipated the new matter in light of the development of the case up to the time the amendment was requested; and (3) the amendment would detrimentally affect the opposing party's presentation of its case. *Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 622 (Tex. App.—Dallas 2010, no pet.).

A summary judgment hearing is a trial within the meaning of Rule 63. *Goswami v. Metro. Sav. & Loan Assoc.*, 751 S.W.2d 487, 490 (Tex. 1988). Contrary to Dickens's argument, this principle extends to hearings on motions for partial summary judgment. *See Valiant Petroleum, Inc. v. FMC Techs., Inc*, No. 13-11-00673-CV, 2013 WL 3377628, at *4 (Tex. App.—Corpus

–25–

Christi July 3, 2013, no pet.) (mem. op.); *Nairn v. Killeen Ind. Sch. Dist.*, 366 S.W.3d 229, 249 (Tex. App.—El Paso 2012, no pet.) (finding no abuse of discretion after trial court struck appellant's petition for not seeking leave after a trial court's ruling on a motion for partial summary judgment); *Cherry v. McCall*, 138 S.W.3d 35, 42–43 (Tex. App.—San Antonio 2004, pet. denied) (upholding a trial court's striking of appellant's amended pleadings which added causes of action, after a hearing and order on a take-nothing partial summary judgment). Therefore, Dickens was required to seek leave of court before filing the amended counterclaim. She did not.

The amended counterclaim added new causes of action against Webster for unjust enrichment, money had and received, and breach of fiduciary duty, and added Quinn as a third party defendant on a claim for quantum meruit. Webster filed a written objection to the amended pleading as constituting a surprise, raising new subject matter that could not have been anticipated, and detrimentally affecting his presentation of the case. The trial court could have reasonably concluded that the amended counterclaim was prejudicial on its face and Webster objected to the amendment. *See Kilpatrick*, 874 S.W.2d at 658; *Halmos*, 314 S.W.3d at 622–23.

Dickens also argues Webster's motion for summary judgment failed to address each of the declaratory judgments she requested in her original counterclaim and therefore was a motion for partial summary judgment. The original counterclaim requested several declarations based on the existence of an enforceable fee sharing agreement between Dickens and Webster. Webster's motion for summary judgment raised the ground that any fee sharing agreement was unenforceable. Under these circumstances, any error by the trial court in granting summary judgment on Dickens's declaratory judgment claims is harmless. *See* TEX. R. APP. P. 44.1(a); *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 298 (Tex. 2011) (per curiam) (summary judgment on cause of action not expressly presented by written motion is erroneous, but "error is harmless when the omitted cause of action is precluded as a matter of law by other grounds raised in the case").

On this record, Dickens has not shown the trial court abused its discretion by striking the amended counterclaim. We overrule Dickens's fifth issue.

## CONCLUSION

We conclude the commercial speech exemption to the TCPA does not apply, but Dickens met her burden under the TCPA to establish by clear and specific evidence a prima facie case on each essential element of her tortious interference with contract claim. We further conclude Texas law applies to the alleged fee sharing agreement; the fee sharing agreement is not enforceable under Texas law because the client did not consent to the arrangement in writing; public policy does not override the express requirements of the Texas Disciplinary Rules of Professional Conduct; and the trial court did not abuse its discretion by striking the amended counterclaim as untimely. We reverse the trial court's August 3, 2016 order dismissing the tortious interference claim and the November 7, 2016 order awarding Webster attorney's fees and costs. In all other respects, we affirm the trial court's final judgment. We remand this case for further proceedings on the tortious interference claim.

/Craig Stoddart/
_____
CRAIG STODDART
JUSTICE

170423F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

LINDA DICKENS AND DICKENS LAW, LLC, Appellants

No. 05-17-00423-CV     V.

JASON C. WEBSTER, P.C. D/B/A THE WEBSTER LAW FIRM AND JASON WEBSTER, Appellees

On Appeal from the 134th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-16-02907.
Opinion delivered by Justice Stoddart. Justices Whitehill and Boatright participating.

In accordance with this Court's opinion of this date, the trial court's August 3, 2016 order dismissing the tortious interference claim and November 7, 2016 order awarding Webster attorney's fees and costs are **REVERSED**. In all other respects, the trial court's final judgment is **AFFIRMED**. We **REMAND** this case for further proceedings on the tortious interference claim.

It is **ORDERED** that bear their own costs of this appeal.

Judgment entered December 31, 2018